UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

DECORATIVE PANELS INTERNATIONAL, INC.,

                     Plaintiff,                           Case No. 13-cv-10798

v                                          Honorable Thomas L. Ludington

INTERNATIONAL ASSOCIATION OF
MACHINISTS AND AEROSPACE WORKERS
LOCAL LODGE W-260,

                     Defendant.

_____/

## ORDER DENYING PLAINTIFF'S MOTION TO VACATE, GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, AND DENYING PLAINTIFF'S MOTION TO STRIKE

Plaintiff Decorative Panels International brought this action to vacate an arbitration award in favor of the International Association of Machinists and Aerospace Workers and Its Lodge W-260 ("the Union"). The arbitration award required that five Union employees be restored to their original jobs and continue receiving their original wages. The award also required DPI to apply for the transfer of an effluent treatment permit. DPI asserts that the award should be vacated because the arbitrator (1) acted outside the scope of his authority since he lacked jurisdiction to order the arbitral award, (2) failed to arguably construe the collective bargaining agreement by finding that DPI did not have the right to subcontract, and (3) granted an award that contravened public policy by ordering a third party to rehire Union workers. Mot. to Vacate, ECF No. 19. DPI also filed a motion to strike, arguing that the award should be vacated because it was procured by fraud or undue means when the Union intentionally misrepresented the state of discovery. *See* Mot. to Strike, ECF No. 29. The Union

counterclaimed, seeking to enforce the arbitration award. Mot. Summ. J., ECF No. 21. For the reasons set forth below, the arbitrator's award will be affirmed.

**I**

DPI is a general production business in Alpena, Michigan, that manufactures solid designer wall panels. DPI also maintains a wastewater treatment area, referred to as the E-Lab, which processes and treats the wastewater from DPI's production facility. Mot. to Vacate Ex. A at 4. The E-Lab is—or was—typically staffed by about five employees covering three shifts on a daily basis. *Id.*

In 2008, DPI began investigating the use of new technology that had been developed by American Process, Inc. ("API"). It was hoped that API's developing technology would permit it to not only treat DPI's wastewater, but would also change the wastewater into useful products such as deicer and ethanol.

DPI and the Union are parties to a collective bargaining agreement (the "CBA"). As part of its general representation duties, the Union represents DPI employees working at the E-Lab. *Id.* In February 2011, DPI informed the Union that it intended to sell some real estate to API, and that API intended to build a Biorefinery on the property deploying the new technology. *Id.* at 5.

In 2012, DPI informed the Union that it had entered into a vendor/customer agreement with API in which API would process wastewater in the E-Lab using its new technology and proprietary equipment. *Id.* In return, DPI would pay API a monthly fee to process the water.[1] *Id.* DPI informed the Union that after the Union employees trained API employees to run the E-Lab, the Union employees would be found alternate jobs within DPI, but at reduced pay rates. *Id.* at 6. Information provided during the October 16, 2012 evidentiary hearing indicates that the contract between DPI and API was not a traditional subcontract. API's interest in entering into the

---

[1] The vendor/customer agreement between DPI and API was never furnished to this Court or to the arbitrator.

subcontract was not simply to perform work that DPI employees had been performing, but rather to reduce the cost of treating the effluent and to produce new products from DPI's effluent. The process for treating the effluent was necessarily experimental and neither DPI nor API knew whether it would work. *See* Mot. to Vacate Ex. D at 24 (DPI President stated that he had "been on the skeptical side from the beginning, which is why we structured the deal the way we did because it's new technology, it's unproven.").

**A**

On April 23, 2012, the Union filed a grievance claiming that DPI violated the CBA by transferring Union work in the E-Lab to API. DPI and the Union submitted the grievance to arbitration, and the arbitrator conducted an evidentiary hearing on October 16, 2012.

DPI made several concessions at the evidentiary hearing that seemingly rendered the hearing unnecessary. First, DPI conceded that the E-Lab had not yet been altered to accommodate the Biorefinery, although DPI still contemplated that it would be. Second, DPI conceded that the original Union employees could and should continue their work in the E-Lab and be paid under the CBA. Mot. to Vacate Ex. A at 23.

On December 5, 2012, the arbitrator sustained the Union's grievance and found that DPI subcontracted its E-Lab work to API in violation of the CBA:

> As a result, DPI's E-Lab operation will have to continue to treat the wastewater whether or not there is a Biorefinery. To date, wastewater continues to be treated through the E-Lab. The difference is that the E-Lab is being operated by API employees rather than bargaining unit employees of DPI.

Mot. to Vacate Ex. A at 22. In reaching his decision, the arbitrator first concluded that DPI's subcontract with API violated the CBA. To justify its position that it had the right to subcontract work to API, DPI had relied on paragraph 11, which provided that DPI "agrees to notify the Union in advance of contracts for construction or major repair work that in its opinion cannot be

performed by the Bargaining Unit due to lack of skills, necessary equipment or completion times." DPI had relied on paragraph 11 as justifying its right to subcontract the work in the E-Lab to API. The arbitrator concluded that the subcontract with API is not "construction or major repair work," and therefore paragraph 11 did not even apply to the situation at hand. But, even if it did, the arbitrator stated that "[t]here is no question that [the Union workers] have the skills to perform the work." Ex. A at 21.

The arbitrator further found, based on the evidence furnished to him, that no new technologies were involved at the E-Lab: "Your arbitrator is not convinced that new technologies are directly involved, in terms of the E-Lab, because presently, the E-Lab is still performing wastewater treatment on the same basis it was performed prior to the work being transferred, or subcontracted, to API employees." *Id.* at 23. DPI had acknowledged that the Biorefinery was not yet in operation in 2012, even though the Union workers had been removed from their jobs seven months prior. The arbitrator noted that the original equipment and facilities in the E-Lab were still available and were being operated by API employees. The arbitrator summarized his findings by stating that "[u]ntil the Biorefinery is in operation, there appears to be no good reason, or logical reason, why bargaining unit employees cannot continue to perform that work. Certainly, nothing of a substantial nature has been emphasized by DPI in this case." Ex. A. at 24.

The arbitrator ordered DPI to reimburse the five employees who had previously worked in the E-Lab the difference between their rates of pay prior to being transferred out of the E-Lab and their rates of pay after being transferred out. *Id.* at 26. The arbitrator also ordered the parties to discuss a resolution that would either allow the Union employees to return to the E-Lab in their former capacities or reach another amicable agreement. *Id*. The arbitrator retained jurisdiction in the December 5, 2012 Award relating to the operation of the E-Lab. *Id*.

**B**

On June 25, 2013, the parties requested a hearing to resolve issues concerning the implementation of the December 5, 2012 Award. Mot. to Vacate Ex. D at 4. DPI contended that the Biorefinery had been completed, thereby integrating the historical E-Lab tasks in the Biorefinery operation. This integration, DPI asserted, meant that the subcontract with API was now permissible under the CBA. On July 29, 2013, the arbitrator conducted another evidentiary hearing.

At the evidentiary hearing, the Union presented the testimony of Mr. Adam King, who had worked in the E-Lab for eight years.[2] During his testimony, Mr. King explained to the arbitrator that the E-Lab's function would remain separate from API's Biorefinery: "King emphasized that the E-Lab and the traditional wastewater treatment facilities of the clarifier and aeration stabilization basin remained intact with a separate functioning Biorefinery . . . ." Mot. to Vacate Ex. D at 6. King explained that even though the Biorefinery was intended to operate independently, it would still remit wastewater to be processed through the E-Lab. *Id*. at 6. Although DPI cross-examined Mr. King, it did not provide any rebuttal to his testimony that the Biorefinery and the E-Lab were separate. *Id*. at 7.

Indeed, the only witness called by DPI at the second evidentiary hearing was Mr. Timothy Clark, the president of DPI. After admitting that he was not an expert in technology, Mr. Clark ended up corroborating Mr. King's testimony. Mr. Clark stated that the E-Lab and the

---

[2] In addition to Mr. King's testimony, the Union also provided the testimony of two other witnesses. The first, James Kinsey, testified regarding the breakdown in negotiations between the Union and DPI following the first arbitral award. Kinsey explained that "the Employer refused to return the E-Lab work to the Bargaining Unit" and then refused to negotiate with the Union about potential settlements. It is unclear what testimony the second witness, Ken Cook, provided. The arbitrator merely notes that Cook testified on behalf of the Union, and that he had done maintenance and repair work in the E-Lab.

Biorefinery remained separate so that DPI could resume the E-Lab work if API's technology did not work. Curiously—even surprisingly—if there were any agreements documenting any of the transactions or contract between DPI and API, those documents were not entered into the record before the arbitrator.  Mot. to Vacate Ex. D at 20 ("If [the wastewater treatment process] proved legally necessary for all the claims of 'integration,' there has been no testimony indicating integration beyond the transfer of wastewater back to the E-Lab.").

In his supplemental arbitration decision, the arbitrator accordingly stated: "I do conclude [DPI] has failed to sustain its burden of demonstrating that new technologies have eliminated E-Lab work or that the Award of December 5, 2012 was incorrect or cannot be carried out. Unfortunately, many of [DPI]'s efforts appear to be an attempt to avoid compliance with that Award." *Id*. at 33-34.

As part of his supplemental award, the arbitrator ordered that:

- the five employees who previously performed the positions of treatment and equipment operator in the E-Lab are to have their positions restored and are to continue to receive E-Lab wage rates

- that work formerly performed by the Bargaining Unit in the E-Lab is to be returned to it no later than one-hundred (100) days from the date of this Supplemental Award to allow the Employer to apply for the transfer of the State of Michigan effluent permit back to DPI

*Id.* at 35. Importantly, however, the arbitrator noted that returning all the original DPI employees to the E-Lab might not be feasible in the future: "the Union should recognize that the number of treatment operators may be diminished because of technological changes as time progresses." Mot. to Vacate Ex. D at 35. Equally important is the arbitrator's conclusion that he would maintain "Jurisdiction . . . until the Award is carried out or in the event questions concerning application of the Award prove necessary."

**II**

In its motion to vacate, DPI attempts to include e-mail correspondence between the parties and the arbitrator that followed the September 10, 2013 supplemental award. *See* Ex. E, F, G, H, I, J, and K. In response to an e-mail by DPI's counsel concerning the arbitration award, API attorneys represented that API had "fundamentally transformed" the E-Lab and that they expected that "[b]y the end of the year, API will have completed integration of the [E-Lab and Biorefinery] . . . ." Mot. to Vacate Ex. F at 2. API's attorney's also insisted that the legal subcontract between API and DPI prevented enforcement of the arbitrator's supplemental award. *Id*. at 3. None of the information contained in API's e-mail chain was presented to the arbitrator at the arbitral hearings.

 After receiving API's e-mail, DPI requested that the arbitrator comment on those concerns. The arbitrator refused to address the concerns, and instead referred the parties back to the text of the supplemental award. *See* Ex. H.

This e-mail correspondence was not before the arbitrator when he made his arbitral decision and awards in December 2012 and July 2013, and therefore it cannot be considered by the Court in determining whether to vacate the award. When reviewing an arbitral award, a court may only consider the decision and the record before the arbitrator. *Batesville Casket Co., Inc. v. United Steelworkers of America*,  2007 WL 4289983, at *1 (E.D. Tenn. Dec. 5, 2007) (citing *JCI Communications, Inc. v. IBEW, Local 103*, 324 F.3d 42, 49-50 (1st Cir. 2003)). Because the e-mail correspondence was not before the arbitrator, the Court may not consider it when deciding whether to vacate the award. However, a review of the communications between counsel for DPI and API is important because it explains for a second time why the arbitrator found DPI's factual assertions to be uncontested by any evidence.

**III**

"When courts are called on to review an arbitrator's decision, the review is very narrow; it is one of the narrowest standards of judicial review in all of American jurisprudence." *Uhl v. Komatsu Forklift Co.*, 512 F.3d 294, 305 (6th Cir. 2008) (quoting *Nationwide Mut. Ins. Co. v. Home Ins. Co.*, 429 F.3d 640, 643 (6th Cir. 2005)). "As long as the arbitrator's award draws its essence from the collective bargaining agreement, and is not merely his own brand of industrial justice, the award is legitimate." *United Paperworkers Int'l Union v. Misco*, 484 U.S. 29, 36, (1987) (quotations omitted).

DPI sets forth three arguments for why the arbitrator's awards should be vacated. First, DPI argues that the arbitrator's decision falls outside the scope of his authority. Second, DPI argues that the arbitrator failed to arguably construe the CBA's terms. Finally, DPI argues that the award should be vacated because it violates public policy.

**A**

DPI first claims that the arbitrator's decision falls outside the scope of his authority because the arbitrator lacked jurisdiction to order API to alter its contract with DPI. In essence, DPI claims that because the award violates public policy, the arbitrator necessarily acted outside the scope of authority in ordering award. DPI's claim conflates the arbitrator's interpretation of the CBA with the relief ordered.

"The burden of proving that an arbitrator exceeded his authority is very great." *Nationwide*, 330 F.3d at 846. The terms of the contract define the powers of the arbitrator, and "as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed a serious error does not suffice to overturn his decision." *Misco*, 484 U.S. at 38. "An arbitrator does not exceed his authority

- 8 -

every time he makes an interpretive error; he exceeds that authority only when the collective bargaining agreement does not commit the dispute to arbitration." *Mich. Family Res, Inc. v. Service Employees Intern. Union Local 517M*, 475 F.3d 746, 756 (6th Cir. 2007). This approach " 'severely curtail[s] the scope of authority concept' " such that an award should not be vacated unless "an arbitrator reaches a question not committed to him by the parties." *Totes Isotoner*, 532 F.3d at 414-15 (quoting *Truck Drivers Local No. 164 v. Allied Waste Sys.*, 512 F.3d 211, 217 (6th Cir.2008) (internal quotation marks omitted)).

Here, the arbitrator's determination that DPI's subcontract with API violated the CBA was an interpretation of the CBA, committed to his discretion and bargained for by the parties. The original grievance underlying the arbitration alleged violations of Articles I, II, IX, XIX, and XX along with all other relevant CBA provisions. Mot. to Vacate Ex. A at 3. The arbitrator interpreted Article XIX of the CBA as prohibiting DPI from subcontracting the E-Lab work to API. Interpretation of Article XIX was explicitly committed to the arbitrator's discretion and it was within his authority to interpret the provision. The arbitrator did not act outside the scope of his authority in determining that the CBA prohibited DPI from subcontracting with API.

After determining that the CBA prohibited subcontracting the E-Lab work, the arbitrator ordered that the five displaced Union workers be returned to the E-Lab. An arbitrator has broad discretion in formulating remedies. *AK Steel Corp*, 163 F.3d at 409. When an arbitrator's award draws its essence from the contract underlying the dispute, the award must be upheld even if the arbitrator is only arguably construing or applying the contract. *Id*. If the language of the contract is not explicit enough to bar the arbitrator's chosen remedy, the arbitrator's judgment will be respected on review. *Id*. Nothing in the CBA explicitly bars the arbitrator's chosen remedy, and

his order is consistent with the lack of evidence demonstrating any limitations on DPI's ability to do so. The arbitrator therefore did not act outside the scope of his authority in ordering that the five Union workers be returned to the E-Lab.

**B**

DPI next asserts that the arbitration award should be vacated because the arbitrator failed to arguably construe the CBA. The arbitrator stated that in the absence of a specific, explicit provision allowing DPI to subcontract, the work subcontracted to API violated the CBA. Mot. to Vacate Ex. A 24. DPI claims that the arbitrator's conclusion that DPI did not have the right to subcontract supports their argument that the arbitrator failed to arguably construe the CBA.

The Sixth Circuit has emphasized that "only the most egregious awards [would] be vacated" under the "arguably construing" standard. *Michigan Family*, 475 F.3d at 753. To determine whether the arbitrator arguably construed the CBA, the Court must focus on a single question: did "the arbitrator appear[] to be engaged in" interpreting the agreement or agreements before him. *Brotherhood of Locomotive Engineers and Trainmen v. United Transp. Union*, 700 F.3d 891, 901 (6th Cir. 2012). "In most cases, it will suffice to enforce the award that the arbitrator appeared to be engaged in interpretation, and if there is doubt we will presume that the arbitrator was doing just that." *MGM Grand Detroit, LLC v. International Union, United Auto., Aerospace and Agr. Implement Workers of Am.*, 495 F. App'x 646, 649 (6th Cir. 2012). Accordingly, an arbitrator fails to "arguably construe" an agreement only when the arbitrator's decision is "so untethered to" the agreements at issue that he enters "the forbidden world of effectively dispensing his own brand of industrial justice." *Id*. at 902 (internal citations and quotations omitted).

Here, the arbitrator analyzed multiple provisions from the CBA and explicitly stated that "[i]n general, arbitrators have recognized the right of management to subcontract in the absence of specific contract restrictions." Mot. to Vacate Ex. A at 18. As DPI points out, the arbitrator even referenced the Elkouri and Elkouri treatise *How Arbitration Works* to support the proposition. Despite this reference, the arbitrator concluded that DPI's subcontracting to API violated the CBA. The record thus shows that the arbitrator considered DPI's argument that it had the right to subcontract and rejected it.

DPI argues that the arbitrator's conclusion that DPI did not have the right to subcontract contradicts the "universal" rule laid in the Elkouri and Elkouri treatise *How Arbitration Works*: "[a]bitrators generally have held that management has the right, if exercised in good faith, to subcontract work to independent contractors . . . unless the agreement specifically restricts the right." Page 13-123. By ignoring this "universal" rule and finding that DPI did not have the right to subcontract, DPI claims that the arbitrator "dispensed his own brand of industrial justice."

But DPI's assertion that the rule is universal is undermined by the treatise itself. First, the treatise qualifies its statement by stating that management "generally"—but not always—has the right to subcontract work. Second, the treatise goes on to state that several courts have held differently: for example, "[w]here subcontracting is used to either replace current employees or in lieu of recalling employees on layoff, [the subcontract] is less likely to be upheld." Page 13-125, 12. According to the treatise, the rule is not universal, and an arbitrator's decision may take into account a variety of factors. *See How Arbitration Works*, (explaining that arbitrators usually consider past practice, justification, effect on the union, effect on unit employees, type of work involved, availability of properly qualified employees, availability of equipment and facilities, regularity of subcontracting, duration of subcontracted work, unusual circumstances and history

of negotiations on the right to subcontract). The arbitrator's decision was not so untethered to the arguments that he failed to arguably construe the CBA.

The arbitrator's opinion has "all the hallmarks of interpretation. He refers to, quotes from and analyzes the pertinent provisions of the agreement, and at no point does he say anything indicating that he was doing anything other than trying to reach a good-faith interpretation of the contract." *Brotherhood of Locomotive Engineers*, 700 F.3d at 905. The arbitrator considered the controlling legal authorities, articulated the correct legal principle, and applied that principle to the terms of the CBA. Accordingly, the arbitrator did not fail to arguably construe the CBA.

## C

DPI's final argument is that the award should be vacated because its enforcement would violate public policy. In response, the Union claims that DPI waived this argument by failing to plead it in the complaint or amended complaint.

### i

The function of a complaint is to afford the defendant fair notice of what the plaintiff's claim is and the ground upon which it rests. *See Conley v. Gibson*, 355 U.S. 41, 47 (1957). A complaint need not set down in detail all the particularities of a plaintiff's claim. *Doe v. Smith*, 429 F.3d 706, 708 ("Complaints initiate the litigation but need not cover everything necessary for the plaintiff to win; factual details and legal arguments come later."). In addition, the Federal Rules encourage courts to decide each claim on its merits rather than on procedural technicalities. *Foman v. Davis*, 371 U.S. 178, 181 (1962) ("It is . . . entirely contrary to the spirit of the Federal Rules of Civil Procedure for decisions on the merits to be avoided on the basis of such mere technicalities.").

- 12 -

DPI filed its original complaint in this Court on February 27, 2013—after the first arbitral award but before the supplemental award issued. *See* Compl., ECF No. 1. The complaint alleges that "[i]n short, the Arbitration Award fails to arguably construe or apply the CBA and violates DPI's right to subcontract." *Id*. at ¶ 14. The complaint could not allege that the supplemental award violates public policy because the supplemental award had not been issued at the time DPI filed its complaint in this Court.

However, DPI was remiss in not asserting the public policy in its amended complaint, which was filed after the supplemental award issued. DPI's amended complaint seeks to vacate the arbitral award because the arbitrator "fail[ed] to arguably construe or apply the CBA and violates DPI's right to subcontract work"—the same grounds listed in the original complaint. Am. Compl. ¶ 14, ECF No. 4. The amended complaint focuses exclusively on these arguments; as the Union correctly contends, DPI did not argue that the award contravenes public policy in its complaint. And even though the parties stipulated to "the Court tak[ing] notice that the Parties' claims and counterclaims in this matter include claims to vacate/enforce the supplemental arbitration award dated September 10, 2013," ECF No. 18, DPI never asserted a public policy argument against returning Union workers to the E-Lab during the supplemental hearing, which would have put the Union on notice regarding the argument.

DPI did not provide adequate notice through pleadings that it intended to assert a public policy argument to vacate the arbitral award, and therefore it waived the argument. However, because of the preference for determining claims on their merits rather than on technicalities, the Court will consider DPI's public policy arguments.

- 13 -

**ii**

A court will not enforce a contract that it independently determines to be contrary to public policy. *MidMichigan Regional Med. Center – Clare v. Professional Employees Div. of Local 79, Service Employee Int'l Union, AFL – CIO*, 183 F.3d 497, 504 (6th Cir. 1999). "[W]hen an arbitration award is challenged on public policy grounds, the court must determine whether the arbitrator's interpretation of the contract jeopardizes a well-defined and dominant public policy, taking the facts as found by the arbitrator." *Board of County Comm'rs v. L. Robert Kimball & Assocs.*, 860 F.2d 683, 686 (6th Cir. 1988) (citing *W.R. Grace & Co. v. Local Union 759*, 461 U.S. 757, 766 (1983)). "The public policy must be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." *MidMichigan Regional*, 183 F.3d at 504.

A generalized sense of public policy provides an insufficient basis upon which to vacate an arbitral award, and a court must review existing statutes, regulations, and judicial decisions to ascertain whether they establish a well-defined and dominant public policy. If positive law does not give rise to such a policy, the inquiry is at an end. *Misco*, 484 U.S. at 43-44. If, however, the court finds that such a policy exists, it must then proceed to the second step and determine whether the arbitral award clearly violates the discerned public policy. *Id.* at 44.

DPI argues that the arbitrator's supplemental award requiring it to rehire the workers and obtain the permit violates public policy in two ways. First, DPI argues that enforcement of the award would require it to breach its contract with API. Second, DPI argues that the award violates public policy by requiring API, an entity that is not a party to the CBA, to employ Union workers. Mot. to Vacate at 19.

- 14 -

**a**

DPI first argues that enforcement would violate public policy because DPI would be required to breach its contract with API. As part of its contact, DPI sold the effluent water to API to process, and now DPI cannot simply "take it back."

The Court notes that, although DPI relies on the contract with API as means to prevent enforcement of the arbitral award, DPI never furnished the actual contract—not during the first arbitration, not during the supplemental arbitration, and not during the proceeding in this Court. Nor did DPI ever explain anything about the integration of the effluent treatment process between the E-Lab and Biorefinery or the effluent treatment process itself to the arbitrator. Despite never presenting any evidence about the contract with API and its effects, DPI now seeks to use the contract to prevent enforcement of the award. Indeed, DPI does not identify the date of the alleged contract, or even when or how it was completed.

DPI has provided no citations to legislation or caselaw that purports to support the alleged public policy. In its brief, Plaintiff cites three cases, none of which supports the contention that there is a well-defined and important public policy against enforcement of the arbitral awards. In the first case cited, *W.R. Grace & Co. v. Local Union 759*, the Supreme Court held that a court may not enforce a collective bargaining agreement that is contrary to public policy. 461 U.S. 757, 766 (1983).  In *W.R. Grace*, Court held that damages were available as an award under the collective bargaining agreement at issue and speculated that, hypothetically, there may be times when an award for specific performance violated public policy. *Id*. at 763-64. The Supreme Court did not articulate a public policy that prohibited enforcement of a contract when enforcement would require a party to breach a subsequent contract.

Nor do the other two cases that DPI cites provide any support for the contention that there was a well-defined and dominant public policy prohibiting enforcement of the supplemental award. In the second case that DPI cites, *Eichleay Corp. v. International Ass'n of Bridge*, the Third Circuit addressed the appropriate scope of an arbitrator's power, not the public policy exception to enforcement of arbitration awards. *See* 944 F.2d 1047 (3d Cir. 1991). The third case, *Teamsters Local Union No. 436 v. J.M. Smucker Co.*, does not address the public policy exception at all. In *Teamsters Local*, the Sixth Circuit upheld an arbitrator's decision that was based on "serious," "improvident" and "silly" errors. *Teamsters Local Union No. 436 v. J.M. Smucker Co.*, 2013 WL 4750782, at *6 (6th Cir. Sept. 5, 2013).

The caselaw provided by DPI is insufficient to show there was a well-defined and dominant public policy. Nor does an independent review by the Court reveal any positive law to support the alleged public policy. In fact, several courts have held that requiring companies to rehire workers after violating subcontracting clauses is an appropriate remedy. *See United Elec., Radio and Mach. Workers of Am. V. Honeywell, Inc.*, 522 F.2d 1221, 1226 (7th Cir. 1975) ("For example, courts repeatedly have upheld awards requiring companies to return operations and equipment which had been moved to other locations in violation of subcontracting clauses."). Because DPI has not articulated a well-defined and dominant public policy against enforcement of the CBA by referencing legislation or caselaw, the Court will not vacate the award.

Although the lack of a well-defined and dominant public policy is sufficient to end the inquiry, in the interests of justice the Court will also address the second step: whether the arbitral award clearly violates the discerned public policy. DPI argues that enforcement of the award would require DPI to breach its later contract with API. But how would the arbitrator know that? How would this Court know that? As explained above, DPI has never provided the contract to

either the arbitrator or this Court. Indeed, even if DPI's claim is true, DPI incapacitated itself by entering into the contract with API with knowledge of the Union's interpretation of the CBA.

In sum, DPI has not shown to the arbitrator or this Court that it would be required to breach an agreement with API if the arbitration award was enforced. Because there is no positive law outlining well-defined and dominant public policy against enforcing a contract that would require a party to breach a subsequent contract, and because there is no evidence that   the supplemental award in this case would violate such a public policy, the Court will not vacate the award on those grounds.

**b**

DPI also argues that, because API is not a party to the CBA, the arbitrator could not order API to re-hire the Union workers in the E-Lab. It is well-defined in the Sixth Circuit that an arbitrator exceeds his or her authority by making an award against person who was not a party to the arbitration proceedings. *See NCR Corp. v. Sac – Co., Inc.*, 43 F.3d 1076, 1080 (6th Cir. 1995); *Nationwide*, 300 F.3d at 846-47; *see also Int'l Bhd. Of Elec. Workers, Local No. 265 v. O.K. Elec. Co.*, 793 F.2d 214, 216 (8th Cir. 1986). Because explicit, well-defined public policy dictates against holding third-parties accountable to a CBA that they are not signatories to, the next step is to determine whether the award clearly violated this public policy.

Although a contract cannot bind a nonparty, nothing in the arbitral award requires API to take any action.  The arbitral award states:

> The Employer [DPI] in this case has not demonstrated legitimate or substantial reasons for modifying the [original arbitral award]. As a result, the five employees who previously performed the positions of treatment and equipment operator at the E-Lab are to have their positions restored and are to continue to receive E-Lab wage rates.

Mot. to Vacate Ex. D at 35. By the terms of the arbitral award, DPI, not API, is to reinstate the original Union workers. If they do not or cannot, the arbitrator has retained jurisdiction to consider why that is true—a proposition for which he has received no contrary evidence to date—and therefore whether his proposed remedy is feasible.

DPI also argues that the arbitrator cannot force API to relinquish its effluent permit because API is not a party to the CBA. Again, nothing in the arbitral award purports to require API to take any action:

> Further, that work formerly performed by the Bargaining Unit in the E-Lab is to be returned to it no later than one-hundred (100) days from the date of this Supplemental Award to allow *the Employer to apply* for the transfer of the State of Michigan effluent permit back to DPI.

Mot. to Vacate Ex. D at 35 (emphasis added). The award explicitly directs DPI to apply for the transfer; it does not direct API to relinquish the permit.

While the arbitrator's decision creates a foreseeable problem for API, it does not direct API to do anyting. The arbitral award does not purport to bind API nor does it adjudicate API's rights, and therefore the award does not violate public policy. *See Belt Ry. Co. of Chicago v. United Transp. Union*, 2012 WL 1118077, at *5 (N.D. Ill. Apr. 3, 2012). Therefore, the Court will not vacate the supplemental award on public policy grounds.

## IV

Although DPI has not provided arguments that would require the Court to vacate the supplemental award, the Court notes that the arbitrator explicitly contemplated further proceedings regarding the enforcement of the supplemental award: "Your Arbitrator will continue jurisdiction over this matter until the Award is carried out or in the event questions concerning the application of the Award prove necessary." Mot. to Vacate Ex. D at 52.

- 18 -

The arbitrator implied that changing circumstances, which DPI has continued to allege but never proven, may necessitate further review of the arbitral award. For example, the arbitrator noted that the number of jobs in the E-Lab could be reduced when new technology is implemented: "the Union should also recognize that the number of treatment operators may be diminished because of technological changes as time progresses." *Id*. Alternatively, the arbitrator implied that the terms of the CBA, could be changed or modified, necessitating a review of the award by the arbitrator: "Obviously, changes and modifications can be made in the Collective Bargaining Agreement through negotiations. *In the interim*, and since there has been an absence of settlement agreement . . . the Bargaining Unit work is to be returned . . . ."*Id*. at 51-52 (emphasis added). The arbitrator thus recognized that the continuing applicability and feasibility of implementing the supplemental award could change.

Recognizing that the supplemental award may need to be altered to accommodate changing relationships between the parties, the arbitrator retained jurisdiction to modify the supplemental award as necessary. Although the Court will not vacate the supplemental award, the Court notes that further proceedings before the arbitrator may be warranted.

**V**

In addition to its motion to vacate, DPI also filed a motion to strike the Union's response to the motion to vacate. *See* Mot. to Strike. DPI asserts that the Union's response intentionally misrepresents the state of discovery in the case. DPI argues that the Court should strike the Union's response to its motion to vacate in full and remand the case to the arbitrator.

**A**

As part of discovery, the Union submitted interrogatories to DPI in an attempt to learn whether any contract existed that would prohibit the Union employees from returning to the E-

Lab. In interrogatory 9 the Union requested that DPI "[i]dentify and describe any clause or section of any agreement, contract or other understanding which would be violated by the return of E-Lab work to the bargaining unit." Instead of answering in the affirmative or provided the contract between DPI and API, DPI unresponsively explained:

> Plaintiff provided arguments, testimony and documents in support of its positions set forth at the evidentiary hearing held on October 16, 2012. Post-hearing briefs were submitted. Plaintiff objects to this interrogatory to the extent that it seeks to relitigate the issues addressed in the arbitration.

Pl.'s Resp. at 4, ECF No. 24.

In interrogatory 7 the Union requested that DPI "[i]dentify and describe what liability DPI would have to API or APB under the Waste Water Agreement or any other agreement, contract, or understanding if it returns the operation of the E-Lab to the Local W-260 bargaining unit." DPI provided the same unresponsive answer as in interrogatory 9.

Prior to the first arbitration hearing, DPI supplemented the interrogatories by providing all contracts between DPI and API to the Union. Mot. to Strike Ex. A. Additionally, at the request of the Union, DPI confirmed in writing its belief and contention that the contracts produced were legal impediments to the return of the E-Lab work to the Union employees. *Id.*

During the supplemental arbitration hearing, the Union submitted DPI's responses to interrogatories 7 and 9 to support its claim that there was no contractual barrier to returning the E-Lab work to the Union employees. The Union did not submit DPI's supplemental responses to the arbitrator. But, importantly, DPI never tendered any of the documents related to DPI's contracts with API to the arbitrator—not the contract itself, and not the supplemental responses referencing the contract with API. The arbitrator, accordingly, ruled in favor of the Union, stating:

- 20 -

> In reviewing the record in this case, *no language was cited or introduced to demonstrate a contractual barrier* to returning the E-Lab work to Bargaining Unit employees at the supplemental arbitration hearing in July 2013. Likewise, no such restrictions were demonstrated at the October 16, 2012 arbitration hearing.

Mot. to Vacate Ex. A at 34 (emphasis added).

## B

DPI argues that the Union intentionally misrepresented the state of discovery, and that the arbitrator's conclusion that there was no contractual barrier was "in clear error." DPI argues that the arbitration award should be vacated because the Union allowed this Court to rely on that clear error.

DPI's arguments are disingenuous. The Union did not intentionally misrepresent the state of discovery; rather, it used the limited facts and non-responsive interrogatory answers that DPI provided. DPI cannot now blame the Union for its decision not to provide any evidence of the contract between DPI and API to the arbitrator. The Union is not obligated to present and argue DPI's case for it.

Even if the arbitrator's conclusion that there was no contractual barrier was "in clear error," the Court could not vacate the arbitral award. "The risk that arbitrators may . . . make errors with respect to the evidence on which they base their rulings[] is a risk that every party to arbitration assumes, and such legal and factual errors lie far outside the category of conduct embraced by § 10(a)(4)." *Kyocera Corp. v. Prudential-Bache Trade Servs., Inc.*, 341 F.3d 987, 1003 (9th  Cir. 2003). An award may not be vacated even if the arbitrator has made a clearly erroneous finding of fact. Thus, even if the arbitrator's conclusion that there was no contractual barrier was clearly erroneous in light of DPI's supplemental discovery responses, the Court may not vacate the award.

DPI also argues that the Union's intentional misrepresentation of the state of discovery warrants vacation of the award. Although not explicitly argued by DPI, the only relevant statutory provision that would support this argument is 9 U.S.C. § 10(a)(1), which states that an arbitration award may be vacated if it was procured by corruption, fraud, or undue means. 9 U.S.C. § 10(a)(1). In reviewing claims under § 10 (a)(1), courts rely on a three-part test to determine whether the arbitration award should be vacated: (1) the plaintiff must establish fraud by clear and convincing evidence; (2) the fraud must not have been discoverable upon the exercise of due diligence prior to or during the arbitration; and (3) the plaintiff must demonstrate that the fraud materially related to an issue in the arbitration. *Pontiac Trail Medical Clinic, P.C. v. PaineWebbber, Inc.*, 1 F.3d 1241 at *4 (6th Cir. July 29, 1993). DPI argues that the Union presented misleading discovery responses to both the arbitrator and to this Court, and therefore the supplemental arbitration award should be vacated.

DPI cannot successfully make out a prima facie claim for fraud where, as here, the fraud was discoverable upon the exercise of due diligence prior to or during the arbitration. The alleged fraud—the Union's failure to present all of DPI's responses to discovery requests to the arbitrator—was certainly discoverable upon the exercise of due diligence because DPI itself provided the responses. At the supplemental hearing, DPI had the opportunity to present the supplemental discovery responses and the contract between DPI and API to the arbitrator. DPI has not provided any evidence that it did in fact present such evidence to the arbitrator. The Union's failure to present DPI's case for it is not fraud. *See United States ex rel WFI Georgia, Inc. v. Gray Ins. Co.*, 701 F.Supp.2d 1320, 1343 (N.D. Ga. 2010).

## VI

DPI has not established that the supplemental arbitration award should be vacated because the arbitrator acted within the scope of his authority and arguably construed the terms of the CBA. In addition, the supplemental arbitration award does not violate public policy. Therefore, the Court will affirm the arbitrator's decisions and awards.

Furthermore, DPI has not established that the arbitration award was procured by fraud or undue means, and DPI's motion to strike will be denied.

Accordingly, it is **ORDERED** that Plaintiff DPI's Motion to Vacate the Decision and Award dated December 5, 2012 (ECF No. 19) is **DENIED**.

It is further **ORDERED** that Defendant IAMAW's Motion for Summary Judgment (ECF No. 21) is **GRANTED**.

It is further **ORDERED** that Plaintiff DPI's Motion to Strike (ECF No. 29) is **DENIED**.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: February 6, 2014

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on February 6, 2014.

s/Tracy A. Jacobs
TRACY A. JACOBS

- 23 -